Mr. Justice SWAYNE
delivered the opinion of the court, having first stated the case, and quoted the statute relating to descents just above set out:
Mary Ann Wolcott, from whom the plaintiff in error claims to have derived his title by inheritance, died nearly four years before his birth. During all the intervening time it is not denied that the title was vested in his mother and her grantee. Such was the effect of the statute. It is clear in its language, and there is no room for controversy upon the subject. Although born after the title became thus vested, he insists that upon his birth it became, to the extent of his claim, divested from the grantee and vested in him. His later birth and relationship to the propositus, he contends, is to be followed by the same results as if he had b.een living at the time of her death.
It is alleged that the rule of “ shifting inheritances,” in the English law of descent, is in force in Illinois, and must govern the decision of this case.
*714 The operation of this rule is thus tersely illustrated in a note by Chitty, in his Blackstone: “ As if an estate is given to an only child, who dies, it may descend to an aunt, who may be stripped of it by an after-born uncle, on whom a subsequent sister of the deceased may enter, and who will again be deprived of the estate by the birth,of a brother. It seems to be determined that every one has a right to retain ih exrents and profits which accrued while he w’as thus legally possessed of the inheritance. Hargrave’s Co. Litt. 11; 3 Wilson, 526.”*
Such is undoubtedly the common law of England.†
It is said the Ordinance of 1787, which embraced the territory now constituting the State of Illinois, and the acts of the legislature of that State of the 4th of February, 1819, and of the 3d of March, 1845, are to be considered in. this connection.
The ordinance created a, court which it declared “shall have common law jurisdiction,” and it guaranteed to the people of the territory “judicial proceedings according to the course of the common law.” There is no allusion in it to the common law but these. The two acts of the legislature contain substantially the same provisions. What is expressed in the second act, and not in the first, is clearly implied in the former. The latter declared that “ the common law of England, so far as the same is applicable and of a general nature,” . . . “shall be the rule of decision, and shall be considered as in full force until repealed by legislative authority.”‡ Mary Ann Wolcott died, and-the plaintiff in error was born before this act became a law, but it may be properly referred to as containing an exposition of the legislative intent in the prior act. Although the former act adopts “the common law of England” in general terms, it was undoubtedly intended to produce that result only so far as that law was “ applicable and of a general nature.”'
By the common law, actual seizin, or seizin in deed, is in *715 dispensable to the inheritable quality of estates. If the ancestor were not seized, however clear his right of property, the heir cannot inherit.
According to the canons of descent, hereditaments descend lineally, but can never ascend. This rule is applied so rigidly that it is said “ the estate shall rather escheat than violate the laws of gravitation.”
The male issue is admitted before the female. "When there are two or more males, the eldest only shall inherit, but females altogether.
Lineal descendants, in infinitum, represent their ancestors, standing in the same place the ancestor would have stood, if living.
On failure of lineal descendants of the ancestor, the inheritance descends to his collateral relations — being of the blood of the first purchaser — subject to the three preceding rules.
The collateral heir of the intestate must be his collateral kinsman of the whole blood.
In collateral inheritances, the male stock is preferred to the female. Kindred of the' blood of the male ancestor, .however remote, are admitted before those of the blood of the female, however near, unless where the lands have, in fact, descended from a female.*
These principles sprang from the martial genius of the feudal system. When that system lost its vigor, and in effect passed away, they were sustained aud cherished by the spirit which controlled the civil polity of the kingdom. The celebrated statute of 12 Charles II, ch. 24, which Blackstone pronounces a greater acquisition to private property than magna charta, was followed by no change in the canons of descent. The dominant principles in the British constitution have always been monarchical and aristocratic. These canons tend to prevent the diffusion of landed property, and to promote its accumulation in the hands .of the few. They thus conserve the splendor of the nobility and the influence *716 of the leading families, and rank and wealth are the bul warks of the throne. The monarch and the aristocracy give to each other reciprocal support. ' Power is ever eager to enlarge and perpetuate itself, and the privileged classes cling to these rules of descent with .a tenacity characteristic of their importance — as means to the end they are intended to help to subserve.
Before the Revolution, some of the colonies had passed laws regulating the descent of real property .upon principles essentially different from those of the common law. In most of them the common law subsisted until after the close of the Revolution and the return of peace. It prevailed in Virginia until the act of her legislature of 1785 took effect, and it was, perhaps, the law upon this subject in “the Northwestern1 Territory,” at the, time of its cession in 1784 by Virginia to the United States. "With the close of the Revolution came a new state of things. There was no monarch, and no privileged class. The equality of the legal rights of every citizen was a maxim universally recognized and acted upon as fundamental. The spirit from which it proceeded has founded and shaped our institutibns, State and National, and has impressed itself upon the entire jurisprudence of the country. One of its most striking manifestations is to be found in the legislation of the States upon the subject under consideration. Of the results an eminent writer thus speaks:
“In the United States the English common law of descents, in its most essential features, has been universally rejected, and each State has established a law of descents for itself.”*
Another writer, no less eminent, upon this topic says': “In the law of descents there is.an almost total change of the common law. It is radically new in each State, bearing no resemblance to the, common law in most of the States, and having great and essential differences in all.”†
So far as British law was taken as the basis of this legis *717 lation, in the different States, it was the statutes of Charles N and James II, respecting the distribution of personal property, and not the canons of descent of the common law. The two systems are radically different in their principles.
The Ordinance of 1787 contains a complete series of provisions upon the subject. They are the type and reflex of the action of many of the States at that time. The ordinance declared that the estates of persons dying intestate “ shall descend to and be distributed among their children, and the descendants of a deceased child, in equal parts; the descendants of a deceased child or grandchild to take the' share of their deceased parent in equal parts among them; and when there shall be no children or’descendants, then in equal parts to the next of kin, in equal degree; and among collaterals the children of a deceased brother or sister of the intestate shall have, in equal parts among them, their deceased parent’s share; and there shall in no case be a distinction between kindred of the whole and half blood.”
We find here not a trace of the common law. These provisions are diametrically opposed to all its leading maxims. We cannot infer from their silence that anything not expressed was intended to be adopted from that source by implication or construction.
The statute governing the descent of real estate, already referred to, is also a complete code upon the subject of which it treats. It is to 'be presumed to cover every ease for which the legislature deemed it proper to provide. If* the same question had come before us under the ordinance, we should have said with reference to the common law, conflict is abrogation and silence is exclusion. The spirit and aims of the two systems are wholly different. One seeks to promote accumulation — the other diffusion. One recognizes and cherishes the exclusive claim of the eldest son— the other the equal rights of all his brothers and sisters. The latter makes no distinction on account of age, sex, or half blood. We apply to the statute also the remark that silence is exclusion. It speaks in the present tense— of the state of things existing at the time of the death of *718 the intestate, and not of any change or different state of things which might occur thereafter. If the legislature had designed to provide for this case, according to the rule insisted upon, we cannot doubt that they would have said so in express terms. The statute bears no marks of haste or inattention. We cannot believe it was intended to leave a rule of the common law so well known, and so important, to be deduced and established only by the doubtful results of discussion and inference. The draughtsman of the bill could not have overlooked it, and the silence of the statute is full of meaning.
One class of posthumous children are provided for. We see no reason to believe that another was intended to be included, especially when the principle involved is so important. The, intention of the legislature .constitutes the law. That intention is manifested alike by what they have said and by what they have omitted to say. Their language is our guide to their meaning, and under the circumstances we can recognize none other. We cannot go farther than they have gone. The plaintiff in error asks us, in effect, to interpolate into the statute a provision which it does not contain. Were we to do so, we' should assume the function of .the legislature and forget that of the court. The limit of the law is the boundary of our authority, and we may not pass it.
The principle contended for was applied in the case of Dunn v. Evans.* The case is briefly reported, and no arguments of counsel appear. It was also adopted in North Carolina, in Cutlar et al. v. Cutlar,† and in Caldwell v. Black.‡ No recognition of it is to be -found, it is believed, in any other American adjudication.
The subject was elaborately examined by the Supreme Court of Ohio in Drake et al. v. Rogers,§ and Dunn v. Evans was overruled. It came before the Supreme Court of Indiana in Cox et al. v. Matthews et al.,ǁ and received there also *719 a thorough examination. The result was the same as in the last case in Ohio. The doctrine was repudiated.
The court said :
"Under the laws of this State it is contemplated that such change of title from one living person to another is to be made by deed duly executed, rather than by our statutes of descent. . . . The feudal policy of tying up estates in the hands of a landed aristocracy, which had much to do with the shifting of descents as recognized by the English canons of descent, is contrary to the spirit of our laws and the genius of our institutions. It has been the policy, in this State, and in this country generally, not only to let estates descend to heirs equally, without reference to sex or primogeniture, but also to make titles secure and safe to those who may purchase from heirs upon whom the . descent may be cast. Our laws have defined and determined who shall inherit estates upon the death of a person seized of lands. When those thus inheriting make conveyances, the purchasers have a right'to rely upon the title thus acquired. If titles thus1 acquired could be defeated by the birth of nearer heirs, perhaps years afterwards, great injustice might, in many cases, be.done, and utter confusion and uncertainty would prevail in reference to titles thus acquired. We are of opinion that the doctrine of shifting descents does not prevail under our laws, any more than the other English rule, that kinsmen of the whole blood, only, can inherit.”
The rule is sanctioned by no American writer upon the law of descents. Judge Reeve,* speaking of distributees, says: “ I am of opinion that such posthumous children who were born at the time of the distribution were entitled, and none others.”
It is to be regretted that we have not the benefit of an adjudication by the Supreme Court of Illinois upon the subject.
Their interpretation — the statute being a local one — would of course be followed in this court. We have, however, no doubt of the soundness of the conclusion we have reached.
*720 We find no error in the record, and the judgment of the Circuit Court is
Affirmed.

 2 Christian’s Blackstone, 208, n. 9.

 Watkins on Descents, 169.

 Revised Statutes of Illinois of 1845, p. 337.

 Watkins on Descents, 95.

 4 Kent’s Commentaries, 412.

 Reeve on Descents, 11.

 7 Ohio, 169.

 2 Hawkes, 324.

 5 Iredell, 463.

 13 Ohio State, 21.

 Indiana, 367.

 On Descents, p. 74, Introduction.